40 C.C.P.A.(Patents)

## GERMESHAUSEN v. HILLIARD.

### No. 5910.

United States Court of Customs and Patent Appeals.

Feb. 6, 1953.

Rehearing Denied March 6, 1953.

through the glass support and extending into, but spaced from, said graphite electrode to act as an anode.

"2. In an electric discharge tube, a graphite electrode and a glass support sealed thereto and a lead-in wire sealed through the glass support and extending into, but spaced from, said graphite electrode, said lead-in wire acting as an anode and being composed of tantalum.

"3. In an electric discharge tube, a cathode of material capable of forming a cathode spot, an insulating cup for the part of said cathode away from the discharge, an annular metal cover for the part of said cathode facing the discharge, and a metal shield spaced from but in register with the center of said annulus.

"4. In an electric discharge tube, a cathode of material capable of forming a cathode spot, an insulating cup for the part of said cathode away from the discharge, an annular metal cover for the part of said cathode facing the discharge, said annular ring acting as a control grid for the discharge, and a metal shield spaced from, but in register with, the center of said annulus.

"5. In an electric discharge tube, a cathode of material capable of forming a cathode spot, said material comprised of caesium chloride and aluminum highly compressed, an insulating cup for the part of said cathode away from the discharge, an annular metal cover for the part of said cathode facing the discharge, said annular ring acting as a control grid for the discharge, and a metal shield spaced from but in register with the center of said annulus.

"6. In an electric discharge tube, a graphite electrode and a glass support sealed thereto and a lead-in wire anode composed of tantalum, sealed through the glass support, and extending into, but spaced from, said graphite electrode and a cathode of material capable of forming a cathode spot, said material

Rines & Rines, Boston, Mass., for appellant.

Paul S. Martin, New York City, for appellee.

Before GARRETT, C. J., and O'CONNELL, J O H N S O N, WORLEY, and COLE, JJ.

COLE, Judge.

That he is the original and first inventor of certain new and useful improvements in gaseous discharge devices is the claim of the appellant in this case. More specifically, the claim is directed to a particular type of cold cathode, gaseous electric-discharge tube known in the art as the Strobotron.

On February 7, 1946, appellant filed his application for the issuance of a patent covering the alleged improvements. On February 8, 1949, an interference proceeding was instituted and declared between his application and a patent (number 2,433,813) granted December 30, 1947, to appellee herein upon an application dated August 23, 1945, for a similar invention. The Sylvania Electric Products Company is the assignee of the patentee-appellee, Robert C. Hilliard, the latter being in the employ of Sylvania at the time of the filing of his application.

All six claims of the Hilliard patent are in issue, and read as follows:

"1. In an electric discharge tube, a graphite electrode and a glass support sealed thereto, and a lead-in wire sealed

comprised of caesium chloride and aluminum highly compressed into a 'pill', an insulating cup for the part of said cathode away from the discharge, an annular metal cover for the part of said cathode facing the discharge, and a metal shield spaced from but in register with the center of said annulus."

The Board of Interference Examiners in an original decision and a further decision on reconsideration awarded priority of invention as to all six counts in issue to the senior party, Robert C. Hilliard.

Any discussion of the inventions herein involved deals with technical apparatus and in particular with the assembly of the electrodes which, together with the gas and enclosing envelope, are the essential elements of an electrical discharge tube. Many descriptive terms known peculiarly to the professions of physics and electrical engineering are employed.

It seems appropriate to set forth at this point figures showing an electrical discharge tube with an explanation accompanying the same. For this purpose, we use Figures 1, 2, and 3 in Letters Patent number 2,433,813 with accompanying description, which were used extensively by counsel during oral argument before us.

Dec. 30, 1947.      R. C. HILLIARD      2,433,813
ELECTRIC DISCHARGE TUBE
Filed Aug. 23, 1945

Fig. 2

Fig. 1

Fig. 3

INVENTOR
Robert C. Hilliard
BY
Lawrence Burns
ATTORNEY

Special attention is directed to anode 14 of Figure 2 which is supported by a glass tube 15. Attention is also directed to the carbon or graphite electrode 17 which is fitted concentrically to glass tube 15. The remaining two elements of the discharge tube that figured prominently in the briefs of both parties are the cathode "pill" 21 of Figures 2 and 3 and the sputter shield 25. The relative size and spacing of anode 14, graphite electrode or grid 17, cathode "pill" 21, and sputter shield 25 determine to a great extent the physical behavior of the discharge tube and hence determine to an equal extent the possible improvement upon the gas-filled electric discharge tube presently under consideration herein.

A general explanation and description of the electric discharge tube disclosed by Hilliard in Letters Patent number 2,433,813 is reproduced in part below:

"This invention relates to gaseous discharge tubes and particularly to those of the type in which the source of electrons is a cathode spot. It may be designed, if desired, so that the short distance between the electrodes makes the tube useful as a rectifier. It may also be used for producing extremely short pulses, and for other purposes.

"An object of this invention is to provide a cold-cathode, gaseous discharge tube which has relatively easy, cathode-spot formation without the necessity of heating power for the filaments.

"Another object of this invention is to provide an electron discharge tube in which the discharge is controlled, without the expenditure of appreciable energy, by the control grids, for producing extremely short pulses and high peak currents.

"A feature of this invention is the use of a carbon grid at the anode to help control the electrode to give a sharp cut-off after the discharge stops.

"Another feature of this invention is the use of a glass tube heated and sealed to the carbon electrode to support it.

"Another feature of this invention is the use of caesium chloride and alumi-num in a highly compressed form as a 'pill'.

"Another feature of this invention is the use of an annular metal grid over the cathode cup to prevent sputtering of the cathode-emitting material and to act as keep-alive, where necessary, and to start the discharge.

"A further feature of this invention is the use of a strap or baffle over said nickel grid to keep sputtered material from forming on the anode grid.

"Other objects and features of this invention will be explained hereinafter and will be particularly pointed out in the appended claims.

"Figure 1 is a perspective view of the cold-cathode gaseous-discharge tube.

"Figure 2 is a longitudinal sectional view of said cold-cathode, gaseous-discharge tube enlarged.

"Figure 3 is a perspective view of the cathode cup in partial section.

"In Figure 1, the anode wire 1 of tantalum is welded to material suitable for sealing the glass and is sealed into the base of a hollow glass tube 2 which supports the carbon grid 3.

"The carbon grid 3 is further supported by a metal strip 4 with metal wires sealed in and supported by the glass sleeves 5. At the cathode, the lead-in wire 6 passes through the insulating ceramic cup 7 to the cathode cup and 'pill'. The ceramic cup 7 is covered by a nickel grid 8 to prevent the sputtering of the cathode-emitting material and thus to act as a keep-alive or to start the discharge. The nickel grid has a hole 9 in it to allow the action of the spot discharge. The cathode is further protected from sputtering by a baffle 10 of metal. The unit is insulated by and mounted upon the glass base 11 and sealed in a glass envelope filled with helium at a pressure of 7 to 20 millimeters.

"In Figure 2, the glass tube 12 is capped by a metal anode cap 13 to which is attached a tantalum wire 14 supported by and insulated by a glass

tube 15, welded to it as in normal tube construction. The wire 14 is separated from the glass tube 15, except at the base, by an air space 16 to prevent cracking from heat. The carbon grid 17 at the anode gives a sharp cut-off after the discharge stops and is supported not only by the glass tube 15 but also by the metal strip 18 upheld by the metal wires 19 supported in the glass sleeves 20. At the cathode, the caesium chloride and aluminum compressed into a 'pill' 21 provide a cathode spot. This 'pill' 21 of cathode-emitting material rests in and is contacted by a nickel cup 22 to which is attached the lead-in wire 23. A ceramic cup 24 surrounding and insulating the cathode is covered with an annular grid 25 to prevent sputtering of the cathode-emitting material and to act as a keep-alive, where necessary. The hole 26 in the metal grid is covered by a strap 27 which further prevents sputtered material from reaching the carbon grid 17. The getter 28 on each side of the glass mounting 29 is attached by a wire 30 to the stem. The entire glass envelope 12 is filled with helium at 7 to 20 millimeters pressure, or any inert gas; helium gas at low pressure may be used to increase the 'hold-off' factor and to make the response of the device quicker. The glass envelope is fastened with cement 32 to a base from which project the pins 33.

"In sealing the glass and the carbon together at the anode, the carbon is heated to the softening point of glass and the glass tube then pushed into the carbon electrode. A mandrel is pushed up into the glass tube during this sealing process to keep the tube open. This process may be useful in other places where keeping the glass tube open is not important, and in those cases a mandrel will not be required.

"In Figure 3, the cathode 'pill' 21 is shown resting in the metal cup 22, said metal cup insulated by the ceramic cup 24. Over all of this is the annular metal grid 24 surmounted by the metal baffle 27.

"This tube may be used in the usual strobotron circuit and in many other types of circuit. I have found my tube particularly useful when used as a rectifier, the grids being in that case connected back to the anode through suitable resistance. The carbon grid in that case may be connected to an intermediate point on the resistance in the metallic grid circuit."

The major improvements in question, as outlined by counsel during oral argument before us and in their respective briefs, are primarily centered about the assembly of anode 14, glass support 15, and graphite or carbon grid 17 of Figure 2, and the positioning of the sputter shield or shields 25 and 27 of Figure 2 relative to the other electrodes of the discharge tube.

The case was submitted upon stipulated evidence by both parties and, as previously stated, the Board of Interference Examiners awarded priority of invention as to all six counts aforesaid to the appellee. Appellant's appeal to this court contains numerous assignments of error, and while they might be readily summarized, references in the briefs and arguments suggest that they be incorporated in their entirety as presented. They are as follows:

"1. In awarding priority of invention to the senior party, Robert C. Hilliard, and in not awarding priority of invention to the junior party, Kenneth J. Germeshausen.

"2. In holding that the party Germeshausen agrees that there is no issue of novelty or priority as to the limitation 'sealed' of counts 1, 2 and 6, and that the question of priority involves only the limitation of 'a metal (sputter) shield spaced from but in register with the center of said annulus'.

"3. In misconstruing the scope of the said limitation 'sealed'.

"4. In holding that counts 1, 2 and 6 are not applicable to the Germeshausen disclosure.

"5. In holding that the party Germeshausen has not proven with the degree required here that he disclosed the invention in issue to Hilliard's assignee, and that this is not, therefore, an originality interference.

"6. In holding that the Hilliard tube of April, 1945, functioned successfully, satisfactorily, creditably, or at all, whether for 170 hours or any other period of time, in the sense that it demonstrated the utility of the said sputter shield, and that it therefore constituted a reduction-to-practice.

"7. In holding that the said Hilliard tube of April, 1945, differed from the tube tested by the Bendix Aviation Corporation, which functioned 60 hours, only in the addition of a sputter shield.

"8. In according to Hilliard the date of April 30, 1945, for actual reduction-to-practice.

"9. In misinterpreting the limitation 'register'.

"10. In holding that the counts are not readable on the Germeshausen disclosure shown in Exhibit 11.

"11. In holding that the tests of Germeshausen's tube 19 did not demonstrate reduction-to-practice, and that Germeshausen has not proven reduction-to-practice prior to April 30, 1945.

"12. In holding that only a life test of Germeshausen's tube No. 19 could demonstrate a reduction-to-practice.

"13. In failing to hold that the tube shown in Exhibit 13, coupled with the tests of the tube shown in Exhibit 11, constitute a reduction-to-practice.

"14. In holding that Germeshausen attempted to test the 'baffle' (sputter shield) of tube No. 22, shown in Exhibit 13, and failing to understand that it was impossible for Germeshausen to make any such attempt, because the said tube No. 22 cracked before the manufacture thereof was completed.

"15. In holding that the critical period for Germeshausen's diligence begins as early as just prior to April 30, 1945, instead of just prior to Hilliard's filing date, August 23, 1945.

"16. In penalizing Germeshausen for the inactivity of the attorney of record, David Rines, during the period in the neighborhood of April 30, 1945, at a time when, insofar as the invention in issue is concerned, the said David Rines had not yet become Germeshausen's attorney, and in failing to hold that, insofar as the invention in issue is concerned, the said David Rines did not yet become Germeshausen's attorney until August 21, 1945.

"17. In holding that, when Germeshausen decided not to secure the services of an attorney, he did so at his peril.

"18. In holding that Germeshausen was not diligent with respect to counts 3, 4, 5 and 6.

"19. In holding that the testimony of the witnesses, Dr. Edward L. Bowles, Dr. Truman S. Gray and the glassblower, Mr. Lawrence W. Ryan, was incompetent, because directed to construing the counts, and failing to understand that the testimony of these three witnesses had to do rather with the meaning of terminology used in the art.

"20. In failing to hold that, as between the parties, there was a presumption that Germeshausen was the inventor of the sputter shield, and not Hilliard."

Essentially, only two features of novelty of invention are in dispute. Specifically, they are the sub-assembly composed of a graphite electrode and a glass support sealed thereto in combination with a tantalum lead-in wire sealed in glass and secondly, a sputter shield, or shields, described as "a metal shield spaced from but in register with the center of said annulus". As a corollary, the issue of reduction to practice and independence of development is presented for our consideration as well as the question of diligence.

The appellant, in his brief, has stated the issues of this appeal with references to his assignments of error as follows:

"As to the first feature of the invention, whether the novelty thereof, as expressed in counts 1 and 2, is directed to the sub-assembly, as a unit, or whether, on the other hand, it is directed merely to Hilliard's stronger or more rigid joint, misdescribed as a 'seal', between the hollow carbon-cylinder grid electrode and the glass-tube support therefor of that unit sub-assembly. In the former event, it is agreed that the award of priority, as to this first feature, should be in favor of Germeshausen. In the latter event, it is similarly agreed that the award of priority should be in favor of Hilliard. This issue is covered by Assignments 1, 2, 3, 4 and 19. * * *"

The Board of Interference Examiners, in awarding priority to the appellee, noted that in the Hilliard patent the glass and the carbon are "sealed" together at the anode by heating the carbon to the softening point of glass and pushing the glass tube into the carbon electrode. While appellant does not contend that he originated Hilliard's process of "sealing," he maintains that his tight fitting joint is the full equivalent of Hilliard's "seal."

In its decision, the board stated:

"We feel that there is a difference between the tight-fitting joint of Germeshausen and the Hilliard "seal". In the Germeshausen subcombination the carbon grid and glass support may become disoriented with respect to each other without rupturing the joint, during the assembling of the tube, but if any movement takes place between the Hilliard grid and glass support it destroys the seal. The Hilliard method of pushing the heat-softened glass into the carbon-cylinder grid must, therefore, create a bond of some type between the glass support and the carbon grid not found in the Germeshausen tight-joint."

With this statement, we are in accord, as it appears to us from a careful analysis of the record that Hilliard's dissatisfaction with the Germeshausen tight fit resulted in the construction by him of a stronger and more reliable sub-assembly. It is certainly significant to note the absence in the Germeshausen disclosure of a rigid bond between the graphite cylinder and the glass tube. In this connection, the board said:

"* * * The Hilliard bond holds the two elements securely in place. The two elements may have relative movement in the Germeshausen joint and, therefore, are not *securely* positioned. * * *" [Italics quoted]

The meaning of the term "sealed" as employed in the Hilliard patent is dwelt with at considerable length in the briefs of both parties and various definitions are sought to be attached to the word as decisive of the issue. In any event, it is manifest that an express limitation cannot be ignored, and the board did not feel that the term was mis-applied, nor did it deem it proper to conclude that "sealed" meant hermetically sealed. Whether or not it is impossible to seal carbon to glass is not the real issue here. Even if such terminology is a misnomer in the glass industry, it is not controlling of Hilliard's intended meaning as applied to the term in his patent. Counts in interference proceedings are to be broadly construed, and it was the board's opinion that, in a proper sense, the term meant securely fastening one element to another. They stated that when two objects are "sealed" together something more is required than a mere tight fit between them. We can find no error in the board's definition of the term, and it is our opinion that the Germeshausen disclosure does not support the limitation "a graphite electrode and a glass support sealed thereto" of counts 1, 2, and 6.

Coming now to a consideration of the second feature of the invention—the sputter shield of counts 3, 4, and 5—appellant states the issue as follows:

"First, whether this is an originality interference. If so, the party Germeshausen is entitled to an award of priority as to counts 3, 4 and 5 upon this one ground alone. This issue is covered by Assignment 5.

"Secondly, whether Germeshausen actually reduced to practice in June, 1943. If the answer to this question should be in the affirmative, this would constitute another, and an independent, ground for an award of priority to the party Germeshausen as to counts 3, 4 and 5. This issue is covered by Assignments 9 to 14, inclusive, and 20.

"Third, whether the sputter shield embodied in the new Strobotron in April, 1945, established an actual reduction-to-practice. If it did, and if it should be held further that that actual reduction-to-practice was Germeshausen's, and not Hilliard's, this would constitute another independent ground for an award of priority to Germeshausen as to counts 3, 4 and 5. This issue is covered by Assignments 6, 7 and 8.

"Fourth, if it should be held that there was no actual reduction-to-practice in April, 1945, or, if there was, that that reduction-to-practice was Hilliard's, and not Germeshausen's, whether Germeshausen was diligent. If it should be held that he was diligent, this would provide still a further independent ground for an award of priority as to counts 3, 4 and 5. This issue is covered by Assignments 15 to 18, inclusive.

"The decision as to count 6, of course, will depend upon the disposition to be made as to the above Assignments relating to counts 1 to 5."

■ Germeshausen, as junior party, carries the burden of proof and he must show by competent evidence that he disclosed the invention to the party Hilliard in such complete detail as the law requires in order to sustain his position that this is an originality interference.

The stipulated facts of record indicate that Germeshausen in 1935 or 1936 entered into an exclusive-license royalty agreement with the Sylvania Electric Products Company, whereby that organization would manufacture and sell appellant's Strobotron tube. It further appears that the tenor of the agreement called for Germeshausen giving Sylvania an opportunity to manufacture such tubes and improvements therein as might be developed by Germeshausen from time to time. The Strobotron tube, as standardized by Sylvania prior to 1942, was designated SN4. In order to adapt the SN4 for use with radar modulators, Germeshausen set out to redesign the SN4 with the object in mind of obtaining the same high currents obtainable with that tube, but at high frequencies and high voltages. Commencement of this work began sometime in 1942 when Germeshausen was busily engaged in confidential war work at the Radiation Laboratory of the Massachusetts Institute of Technology. Early in 1944, Germeshausen brought to Sylvania his improved tube, later to be designated SH4 to distinguish it from the standardized commercial SN4 Strobotron, and it was tested by the Bendix Aviation Corporation. Following the test, Germeshausen noted that the anode was quite worn. A number of SH4's were built by Sylvania and sold to the Signal Corps.

Thereupon, in March 1944, Sylvania assigned Hilliard to the task of aiding in the development of a final model of the SH4. Although Hilliard did not devote his full time to the SH4, he directly assumed charge of such development from April 1944 to August 1945.

It will be noted that counts 3, 4 and 5 each contain the limitation, "a metal shield spaced from but in register with the center of said annulus," the shield in question being described in the briefs of the parties as a "sputter" shield. Priority involves this limitation only. The shield in question tends to prevent the deposit of caesium "sputtered" out of the cathode onto the grid. Prior conception of the sputter shield is conceded to Germeshausen.

In ruling against Germeshausen on the originality issue, the Board of Interference Examiners said:

"The Germeshausen record shows that he had licensed Hilliard's assignee, Sylvania Electric Products Inc. to manufacture tubes of the cold cathode gas filled electric discharge type. (Strobotron) Under the agreement

Germeshausen was obligated to call to the attention of Sylvania related tube developments and give to Sylvania an opportunity to manufacture such tubes as he might develop from time to time. On June 10, 1943, under this agreement, Germeshausen allegedly disclosed the results of his research to two of Sylvania's engineers, Donald J. Coggins and Howard B. Sloan. * * "

The board concluded that in view of testimony given by Sloan and Coggins to the contrary, as well as certain conjectural statements made by Germeshausen in his brief on this point, a finding of originality was not warranted.

Germeshausen makes mention of certain conferences with Sylvania's engineers, above mentioned, and relates that during these meetings he disclosed certain details of his research. These engineers, as well as Hilliard, deny having any recollection of the disclosure by Germeshausen of a sputter shield. Affirmatively, Coggins and Sloan have stated that they considered the sputter shield to be the invention of Hilliard.

■ It is important to note that Germeshausen does not affirmatively state that he did disclose the sputter shield feature of his invention to these witnesses, or to Hilliard. He presumes he did, but the adoption of such a presumption is not sufficiently supported by the record. Further, as both parties are capable engineers and it is not clearly apparent from the record just what position or relationship Hilliard and Germeshausen occupied in perfecting the SH4, appellant's allegation that Hilliard was, in effect, his assistant is without merit. On this point, the board said:

"* * * Germeshausen may have been quite an experienced inventor and Hilliard may have been quite new in this work *when* assigned to it but Hilliard had been directly in charge of the work for nearly a year when he invented his 'sputter shield'. Hilliard was a capable engineer, was employed by Sylvania beginning in December 1940 and, therefore, must have been more than a novice when he invented his 'sputter shield'. * * *" [Italics quoted.]

Germeshausen in his brief states:

"There is absent any testimony, however, that Hilliard himself ever independently conceived the sputter shield, or the circumstances under which, or the time when, he arrived at any such independent conception, if he ever did. There appears to be no reason, indeed, why Hilliard should independently have conceived the sputter shield. * * *"

Under the circumstances, however, we must agree with the Board of Interference Examiners and conclude that the burden of proof necessary to establish originality interference has not been satisfactorily carried. The negative reasoning employed by the appellant herein cannot induce the positive results sought.

■ Considering now the priority of award with respect to counts 3, 4 and 5, relative to the reduction to practice issue, Hilliard alleges that his invention was reduced to practice on October 15, 1944, and disclosed to others on or about that same day. Germeshausen contends that he actually reduced to practice in June of 1943.

The limitation in question, "a metal shield spaced from but in register with the center of said annulus," reads on the disclosure of each party. The board, in interpreting the limitation, stated that a round metal cover, having an opening in the center, is placed over the cathode and the sputter shield is so mounted that it is supported between the opening in the grid. The shield is spaced from, but in register with, the opening in the cover. Hilliard mounts his shield directly on the nickel cover while Germeshausen shows the shield suspended from the grid support. That the embodiment of the sputter shield into the tube extends the useful life of the tube is conceded by both parties.

As noted, Germeshausen's first records disclosing conception of the sputter shield appear in June, 1943. Well satisfied with experimental tube 19 as solving the problem relating to prevention of deposits of caesium on the grid through employment of

said shield, Germeshausen alleges that he thereafter directed his attention to the solving of other problems. Although Germeshausen deemed the operability of the sputter shield to be established, he tried out different shapes of the shield in question. Tube 22, containing a sputter shield of different shape cracked and appellant decided thereafter not to devote further effort in that direction.

In his brief, Germeshausen gives the results of certain tests conducted by a Mr. Krulikoski, his assistant, with tube 19, and the following from that brief is here pertinent:

"* * * The tests demonstrated, after only 17.8 hours, therefore, that Mr. Krulikoski had successfully carried out the task that Germeshausen had set him to perform, as recorded on page 21 of his notebook, Exhibit, 10A, namely to 'hide the anode more completely from the cathode', thus preventing the caesium that became sputtered out of the cathode from becoming deposited upon the inner surface of the carbon-cylinder grid electrode.

\* \* \* \* \* \*

"More than that, indeed, the tests that Mr. Krulikoski performed with the tube No. 19 did not need to be stopped after only 17.8 hours. There is no evidence that, as the Board held (R. p. 135), this tube 'lasted' only 17.8 hours. The tests with this tube No. 19 could have been carried on for many more hours, if there had been any need to do so.

\* \* \* \* \* \*

"The fact that Germeshausen contemplated testing different shapes of sputter shield, with the object in view of determining whether one shape might constitute an improvement upon another, similarly does not demonstrate that Mr. Krulikoski's tests of the tube No. 19 did not constitute a reduction-to-practice of the sputter shield."

In March of 1945, forty of the tubes in question, without a sputter shield, were sold to the Signal Corps. In April of 1945, Hilliard added a sputter shield to this type of tube and demonstrated its operation for 170 hours. Prior to this time, in early 1944, the Bendix Aviation Corporation tested Germeshausen's SH4, without sputter shield, and it functioned for sixty hours.

The board, in this connection, said:

"* * * The Bendix tested tube functioned 60 hours. The Hilliard tested tube functioned successfully for 170 hours. The record is plain that the only difference between the two tubes was the addition of a sputter shield to the Hilliard tested tube.

\* \* \* \* \* \*

"It is our opinion that the Hilliard test was as highly successful as the Bendix Aviation Corporation test and positively proves reduction to practice. Accordingly, we accord Hilliard the date of April 30, 1945 for actual reduction to practice.

\* \* \* \* \* \*

"Further tube No. 19 as tested in Exhibit 11 apparatus, lasted less than 18 hours (Germeshausen Rec., Par. 41). This is no convincing indication that the life of this tube was benefited by using a sputter shield. Tube No. 15, a very similar tube but without a sputter shield, had 38 hours running time (Germeshausen's Rec. Par. 31).

"For the foregoing reasons Germeshausen has not shown to our satisfaction that the tests in question constituted a reduction to practice."

The board further held that tube 19 was not within the counts because the sputter shield, though spaced from the center of the annulus, was not in register therewith as specified in the counts. Germeshausen urges that there is no limitation in the counts that the sputter shield and the anode must be positioned directly over the cathode, nor any statement in Hilliard's specification showing an intent to restrict the word "register" to a construction in which the sputter shield and the anode must be positioned directly over the cathode. In answer to this contention, the board said:

"* * * Germeshausen admittedly does not disclose the structure.

Further, these counts call for, 'a metal shield spaced from, but in register with, the center of said annulus'. Germeshausen points out that the word 'register' is not used in the specification of the involved Hilliard patent. The figures of the drawing of a patent are a part of its disclosure. The sputter shield 27, as illustrated in the Hilliard patent, is clearly in *register* with the *center* of cover 25. We see nothing unusually broad about the counts in question, certainly nothing sufficiently broad to warrant a holding that they are readable on the Germeshausen disclosure shown in Exhibit 11." (Italics quoted)

We must agree with the decision of the board in its entirety on the issue of reduction to practice. We are able to discern some merit in the arguments advanced by appellant but, in our opinion, the proof he offers is not sufficiently conclusive to warrant a reversal of the well considered opinion below.

■ In order to prevail at this juncture of the case, the appellant must prove that he was diligent during the critical period—just prior to April 30, 1945, up to the time that he filed his application in February of 1946. Appellant argues that the board was in error in awarding April 30, 1945 to Hilliard as the date Hilliard reduced his invention to practice because the record does not contain any evidence whatsoever that the April, 1945 tube operated any better, or any worse, with the sputter shield incorporated therein and that consequently, mere embodiment of the sputter shield in Hilliard's tube of April, 1945, does not thereby prove a successful reduction to practice. It is, however, clear that Hilliard conceived the invention no later than April, 1945, and in the absence of direct proof to the contrary to the effect that the board was manifestly in error in awarding such date as establishing a reduction to practice, we must concur with the findings of the board. In doing so, we have considered the proof offered by Germeshausen in support of his contention, but do not find it sufficiently convincing.

The stipulated facts of record relative to Germeshausen's activities during the critical period were accurately summarized by the board as follows:

"* * * Germeshausen alleges that on October 3, 1944, he made the four sheets of sketches and descriptive matter, Exhibit 29, to give to his patent attorney for the purpose of aiding him in preparing a patent application. Since Germeshausen's tube had a bearing upon the prosecution of the war he was required to secure the permission of the United States government to disclose the contents of Exhibit 29 to his attorney. This permission was received by Germeshausen some time in the forepart of February, 1945. At about this time Germeshausen's attorney began the study of medicine in a medical school which engaged his full time for a number of months (Rec., Par. 63). As his attorney was thoroughly familiar with the art, Germeshausen considered that it would be time-saving, in the end, to wait until his attorney was available rather than train a new attorney in the art. When his attorney became available Germeshausen was required to give his entire attention to official and other duties and it was not until August 21, 1945, that the two had an opportunity to meet in a conference. Owing to the large number of other matters considered at this conference, Germeshausen did not make the disclosure of his tube sufficiently complete for the purpose of preparing a patent application. Several drafts of a proposed application were consecutively drawn up and the final draft was mailed to Germeshausen on January 30, 1946. Germeshausen executed this promptly and the application was filed on February 7, 1946."

While Germeshausen had, in the past, employed Rines as his attorney in connection with other patent matters, it is alleged that he did not so employ that attorney in connection with the invention in question until August 21, 1945. The rec-

ord, however, clearly shows that in requesting permission of the United States Government in October, 1944 to file a patent application for the invention in issue, Germeshausen referred to Rines as his attorney. In February, 1945, when Germeshausen's request was granted, he again made reference to Rines as his attorney in the following manner: (stipulated testimony on behalf of Germeshausen)

"On February 11, 1945, and for a number of months thereafter, Germeshausen's attorney, the said David Rines, was engaged, full time, during the day and at night, in the study of medicine, at a medical school. * *"

In addition, Germeshausen testified:

" * * * Germeshausen therefore, considered that it would be time-saving, in the end, to wait until the end of the medical-school year, in late May or early June, when Mr. Rines would become freed from his medical studies, * * *"

The board was of the opinion that Germeshausen had decided to retain attorney Rines in February of 1945 and would have entrusted his case to him had Rines been free at that time. Germeshausen contends that there is no evidence to support such a finding by the board, that it is pure guesswork, and that there is no implication to be gathered one way or the other.

It appears to us, however, as it did to the board, that when Germeshausen decided to wait for Rines to finish the medical school year, and not train a new attorney in the Strobotron art, he was retaining Rines as his attorney. On May 26, 1945, according to the stipulated testimony, Rines once again began working for his clients, although he did not return to his office in Boston until June 6, 1945, at which time "he plunged into other work that had accumulated during the medical-school year." While Germeshausen had, in October, 1944, prepared sketches and an explanation of their features for disclosure to attorney Rines, he did not forward them to his attorney, although it appears that Rines had once again resumed the practice of law and was available in the latter part of May or early June. The record states that Germeshausen constantly bore his new tube in mind and on June 20, 1945, made additional drawings, but could not, at that time, consult with his attorney. Although Germeshausen may have been deeply engrossed with his official duties, as well as private business matters, during May, June, July, and half of August, 1945, we think it is significant to note the absence of any explanation relative to Germeshausen's failure to send his prepared disclosures to Rines.

The board, in their opinion, commented on the fact that during part of the critical period Germeshausen's attorney was devoting his time to an entirely unrelated undertaking, not directed to the invention in issue, and stated further:

" * * * Employing critical time to gain knowledge of an entirely unrelated art cannot be considered as diligence. * * *"

We are in accord with that view, concluding as we do that an attorney-client relationship existed during the critical period.

While we are not unmindful of the special circumstances relating to the nature of Germeshausen's work, his necessary concern with private partnership matters, and the fact that his activities beginning with the commencement of the late war until the arrival of V-J day were extremely burdensome and required much of his time, we are of the opinion that he has failed to establish the necessary acts of diligence between April, 1945, and August 21, 1945.

For the reasons hereinbefore set out, the decision of the Board of Interference Examiners is affirmed.

Affirmed.

JOHNSON, J., concurs in the conclusion.